IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA GLODEK,          :
:
        Plaintiff        :          No. 4:07-CV-2237
:
    v.                 :          (Judge McClure)
:
JERSEY SHORE STATE BANK,  :
:
        Defendant.     :

**M E M O R A N D U M**

August 28, 2009

**BACKGROUND:**

On December 7, 2007, plaintiff, Patricia Glodek, instituted this civil action against defendant, Jersey Shore State Bank ("JSSB" or the "Bank"), setting forth a claim pursuant to the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d),  and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). (Rec. Doc. No. 1).  In her two-part complaint, plaintiff contends that JSSB intentionally discriminated against her on the basis of gender by paying her less than a male employee who performed substantially equal work. (Id.)

Defendant asserts, inter alia, that plaintiff fails to establish a prima facie case for an EPA violation or Title VII unequal pay discrimination, and that, even if she

did, defendant has refuted the prima facie cases by proving that any pay

discrepancy was based on factors other than sex. See (Rec. Doc. No. 21).

On April 14, 2009, defendant filed its motion for summary judgment, (Rec.

Doc. No. 19), accompanied by a statement of material facts ("SMF"), (Rec. Doc.

No. 20) and a supporting brief, (Rec. Doc. No. 21).  On May 15, 2009, Plaintiff

timely filed her opposition brief, (Rec. Doc. No. 26), with her SMF, (Rec. Doc. No.

27).  Defendant filed its reply brief on June 4, 2009.  (Rec. Doc. No. 29).

In response to plaintiff's SMF, defendant filed a motion to admit defendant's

SMF or strike portions of plaintiff's SMF.[1]  (Rec. Doc. No. 30).  The appropriate

---

[1]Defendant claims that plaintiff's SMF "contains numerous inflammatory
factual assertions without citation to any record evidence, clear misrepresentations
of the record evidence, legal conclusions and/or pure argument" in violation of
L.R. 56.1.  (Rec. Doc. No. 31, p. 2).  Defendant also correctly notes that we may,
but are not required to, grant its motion.  See (Id. at p. 4).

Although we recognize that portions of a number of paragraphs included in
plaintiff's SMF are improper, those paragraphs also contain poignant information.
Traditionally, in situations such as this, it is not the practice of this Court to strike a
party's SMF, either in whole or in part, or admit the opposition party's SMF
wholesale.  Instead, in evaluating motions for summary judgment, we glean what
useful information we can from the parties' SMFs and disavow improper or
unsupported entries, or portions thereof.  In fairness, it is important to note that
defendant's SMF also contains argument, misrepresentation and, in some cases,
statements that are clearly unsubstantiated by the record.

Therefore, having reviewed plaintiff's SMF and found that it facilitates the
court's consideration of the summary judgment motion, we shall adhere to our
traditional practice and deny defendant's motion to strike plaintiff's SMF or admit
its SMF.

briefs were timely filed. <u>See</u> (Rec. Doc. No. 31; Rec. Doc. No. 32; Rec. Doc. No. 33).

The parties have completed discovery and defendant's motion for summary judgment is ripe for disposition. For the following reasons, we will deny defendant's motion.

**DISCUSSION:**

## I. <u>Standard of Review</u>

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit. <u>Id.</u>; <u>Justofin v. Metropolitan Life Ins. Co.</u>, 372 F.3d 517, 521 (3d Cir. 2004).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" <u>Jalil v. Avdel</u>

Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc.,

814 F.2d 893, 896 (3d. Cir. 1987)); see also Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).

In evaluating a motion for summary judgment the court will draw all

reasonable inferences from the evidence in the record in favor of the nonmoving

party.  Am. Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, 578

(3d Cir. 1995).  The nonmoving party, however, cannot defeat a motion for

summary judgment by merely offering general denials, vague allegations, or

conclusory statements; rather the party must point to specific evidence in the

record that demonstrates that there is a genuine issue as to a material fact.  See

Celotex, 477 U.S. at 321; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d

238, 252 (3d Cir. 1999).

## II.  Statement of Facts

The relevant facts viewed in the light most favorable to the plaintiff are as

follows:

Defendant is a publicly traded company with offices in three (3)

Pennsylvania counties and a corporate headquarters in Williamsport, Pennsylvania.

(Rec. Doc. No. 20, p. 2, ¶ 2).

Plaintiff is a woman who began working for defendant as a Mortgage

Originator ("MO")[2] in August 1999 at the Montgomery Branch office ("MBO"). (Rec. Doc. No. 20, pp. 1-2, ¶ 1; Id. at p. 6, ¶ 34). Prior to Glodek's employment with JSSB, she worked in loan and mortgage origination for approximately ten (10) years with various banks and financial services companies. See (Rec. Doc. No. 28-2, pp. 4-19; Rec. Doc. No. 28-9, p. 6). In addition to the formal experience acquired throughout her career, plaintiff achieved a 4.0 GPA while studying accounting for one (1) year at Harford Community College and augmented her education further via consumer lending and residential mortgage loan origination courses offered by the Institute of Financial Education. (Rec. Doc. No. 28-9, pp. 4, 6).

At all times relevant to these proceedings, JSSB's Mortgage Department maintained MOs in five (5) offices, located in Williamsport, Jersey Shore, Montgomery, Lock Haven and State College, Pennsylvania. (Rec. Doc. No. 20, p. 2, ¶ 6). Although permitted to conduct business outside of their assigned territories, JSSB instructed its MOs to focus on their assigned markets to avoid

---

[2]The job title and description for the each MO position was identical. See (Rec. Doc. No. 28-7, p. 2). According to the description, MOs "[i]nterview applicants for evaluation of Jersey Shore State Bank loan products, with prime responsibilities of generating secondary market one-to-four family residential mortgages for sale. Underwrite and assist with all aspects of loan origination including closing and any post settlement requirements." (Id.).

overlapping with MOs stationed in other offices.  (Rec. Doc. No. 20, p. 2, ¶ 7).

Despite the individual offices, all MOs reported to the head of JSSB's Mortgage

Department, Vice President Gerald Seman, who worked in the Bank's corporate

offices in Williamsport.  (Id. at p.2, ¶ 4).

Salary is JSSB's exclusive compensation method.  (Rec. Doc. No. 20, p. 3, ¶

15).  Generally, in determining an employee's salary, JSSB considers, inter alia,

the employee's initial salary demand, the salary the employee earned with his or

her prior employer, comparable salaries in the market in which the employee will

work, wage surveys, the education/training background of the employee, the

markets in which the employee has previously worked, the employee's reputation

in the mortgage community, the employee's book of business, the length of time

the employee has worked at JSSB and the employee's performance with JSSB.

(Id. at pp. 3-4, 9, ¶¶ 16, 19, 65).  When examining employee performance, JSSB

considers, inter alia, the number of loans issued, the number of exceptions for each

loan, the employee's historical production and the employee's production in

relation to the annual goals established for the individual MO at the beginning of

each fiscal year  (Id. at pp. 5-6, ¶¶ 23, 30).  Production goals were established

based upon the geographic market, support staff available, strength of existing

market conditions, prior year's performance, JSSB's presence within the market

and existing real estate relationships of each specific MO. See, e.g., (Rec. Doc. No. 22-2, p. 49).

When Glodek applied for her position at JSSB, she expressed an interest in earning, (Rec. Doc. No. 28-9, p. 2), and received a salary of $25,000 per year. (Rec. Doc. No. 28-8, p. 2). Plaintiff's salary increased to $30,638, (Id.),[3] prior to her voluntary resignation in March 2005. (Rec. Doc. No. 20, p. 1-2, ¶ 1). During this time period, Glodek's production ranked sixth (6th) out of seven (7) MOs in 2001, fourth (4th) out of seven (7) in 2002, sixth (6th) out of eight (8) in 2003, seventh (7th) out of eight (8) in 2004 and sixth (6th) out of eight (8) in 2005, prior to her departure from JSSB. (Rec. Doc. No. 27, p. 8, ¶ 43).

In October 2003, Cory Knight, the comparator in the case at bar, was hired as an MO for the State College office ("SCO"), (Rec. Doc. No. 20, p. 8, ¶ 50), signaling JSSB's intent to grow the SCO's mortgage business. (Id. at p. 8, ¶ 56). In comparison to the SCO, the MBO, located in a rural area, was small in stature, (Rec. Doc. No. 22-2, pp. 14-15), and competed with fewer banks and mortgage

---

[3]Glodek's yearly salaries during her employment at JSSB were as follows: $25,000 (2000); $26,000 (2001); $27,102 (2002); $28,246 (2003); $29,494 (2004); and, $30,638 (2005).

services companies.  (Rec. Doc. No. 22-6, p. 23).[4]  As the lone MO working out of

the MBO, however, Glodek was responsible for a significant geographic territory,

including portions of Lycoming County and Snyder, Union, Montour and

Northumberland Counties in their entirety.  See (Rec. Doc. No. 28-3, pp. 7-8).

Prior to his employment with defendant, Knight studied marketing and small

business management at Bob Jones University for four (4) years and amassed

approximately eight (8) years of mortgage services industry experience.  See (Rec.

Doc. No. 28-12, pp. 3-4, 6-7).  This included twenty-seven (27) months of

mortgage origination experience, see (id. at 3), twenty-two (22) of which were

spent working for two (2) national mortgage lenders, Washington Mutual and

Wells Fargo, where Knight received the regional top producer awards in 2001 and

2002.  (Id. at p. 6),[5] in State College.  (Rec. Doc. No. 20, p. 8, ¶ 52); see (Rec. Doc.

No. 28-12, pp. 3, 6-7).  In these positions, he focused mainly on subprime lending

products.  (Rec. Doc. No. 28-3, p. 18).  Although JSSB did not market these

commodities, instead focusing on Pennsylvania Housing Finance Agency

---

[4]Ronald Walko, President of JSSB, noted that the SCO competed with at
least nineteen (19) banks at the time of his deposition.  Id.  However, no
information is provided regarding how many banks existed in that market during
the times relevant to this case.

[5]Wells Fargo included State College in the region which covered the
"eastern half of Ohio, western half of Pennsylvania, and West Virginia."  See (id.)

("PHFA") loans with which Knight had no experience, (Rec. Doc. No. 28-6, p. 5),

"anyone in [the mortgage] industry would realize that subprime lending is a lot

harder than conventional lending." (Rec. Doc. No. 28-3, p. 18). Furthermore, the

contacts necessary to generate business from either product are the same. (Rec.

Doc. No. 28-6, p. 5).

In granting Knight's $48,000 yearly salary demand, (Rec. Doc. No. 20, p. 9,

¶ 63),[6] the Bank also considered that he earned a commission-based salary of

between $60,000 and $72,000 during his final year of employment at Washington

Mutual. (Rec. Doc. No. 20, p. 9, ¶¶ 60-61; Rec. Doc. No. 27, p. 11, ¶ 60). The

Bank believed that Knight's success based in the State College market and his

contacts therein would be valuable assets to its SCO. (Rec. Doc. No. 20, p. 9, ¶

62). Moreover, JSSB thought that "wage pressures" within the marketplace

indicated that it needed to increase salaries to recruit "producers" successfully. See

(Rec. Doc. No. 22-3, p. 31).

During his first and only full fiscal year at JSSB, the Bank set Knight's

production goal at $9 million. (Rec. Doc. No. 28-14, p. 3). Glodek's goal was set

at $6.1 million for the same time period. (Id. at p. 2). Neither individual reached

---

[6]Knight's yearly salaries during his employment at JSSB were as follows:
$45,006 (2003); $46,211(2004); and, $47,050 (2005). (Rec. Doc. No. 28-8, p. 2).

his or her target, producing $7,067,546 and $4,122,250, respectively. (Rec. Doc. No. 28-10, p. 5). For the 2004-05 fiscal year, the Bank's goal for Knight was $12.5 million, (Rec. Doc. No. 28-14, p. 5), and $7.345 million for Glodek. (Id. at p. 4). The loan report issued following Glodek's resignation indicated that Knight had outperformed Glodek through April 2005, $1,574,385 to $1,415,700. (Rec. Doc. No. 28-10, p. 6).

Regarding the MO staff as a whole, Brenda Thompson Bryerton, consistently the most productive MO, (Rec. Doc. No. 28-10, pp. 2-6), commanded the highest salary in the department until Knight was hired in October 2003. See (Rec. Doc. No. 28-8, p. 2). In January 2004, Bryerton reemerged as the highest paid MO, remaining so throughout the times relevant to this case. See (id.). However, no other female MO was paid more than a male counterpart, see (id.), production notwithstanding, see (Rec. Doc. No. 28-10, pp. 2-6), until 2007. See (Rec. Doc. No. 28-8, p. 2). Some of these MOs, including Kim Walker, Gail Rice and Stacy Anderson, advanced into their positions from other departments or positions within the bank. (Rec. Doc. No. 20, p. 4, ¶¶ 20-21). As a result, their lack of sales experience, product knowledge and/or book of business was taken into account in establishing their initial salaries. (Id. at 21). However, following 2004, in which Knight closed $7,067,546 worth of loans and Walker closed

$13,179,795, having closed $12,986,146 in loans the previous year, Knight's 2005

salary exceeded Walker's by $11,274 and Glodek's by $16,412.  See (Rec. Doc.

No. 28-8, p. 2).

### III.  Plaintiff's EPA Claim

Claims brought under the EPA involve a two-step burden shifting standard.

Plaintiff bears the initial burden of demonstrating a prima facie case that

"employees of the opposite sex were paid differently for performing equal work . .

. of substantially equal skill, effort and responsibility, under similar working

conditions."  See Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000); see

also 29 C.F.R. § 1620.14(a).[7]  In addition to similar working conditions, we have

previously noted that "[t]hese three terms-skill, effort, responsibility-'constitute

separate tests, each of which must be met in order for the equal pay standard to

apply.'"  Welde v. Tetley, Inc., 864 F. Supp. 440, 442 (M.D. Pa. 1994) (McClure,

J.) (quoting 29 C.F.R. § 1620.14(a)).

Although claimant need not establish that the jobs are identical, she must

---

[7]"Skill" refers to the "experience, training, education, and ability" required
by the position.  29 C.F.R. § 1620.15(a).  "Effort" pertains to the physical and
mental acuity that the employees must possess.  29 C.F.R. § 1620.16(a).  And,
responsibility concerns "the degree of accountability required in the performance
of the job, with emphasis on the importance of the job obligation." 29 C.F.R. §
1620.17(a).

show that her position shares a "'common core of tasks'" with the position

occupied by the comparator of the opposite sex.  Lord v. Pennsylvania Nat. Mut.

Cas. Ins. Co., No. 1:07-CV-1229, 2009 WL 55949, at *1 (M.D. Pa. Jan. 7, 2009)

(Conner, J.) (quoting Brobst v. Columbus Servs. Int'l, 761 F.2d 148, 156 (3d Cir.

1985)).  In determining whether a "common core" exists, "[a]ctual job performance

and content-not job titles, classifications or descriptions-is determinative."  Welde,

864 F. Supp. at 443 (citations omitted).  Should plaintiff establish a "common

core," "[t]he inquiry then turns to whether the differing or additional tasks make

the work substantially different."  Brobst, 761 F.2d at 156 (citations omitted).

It should be noted, however, that "mere comparability of positions is not

sufficient to give rise to an inference that the positions under scrutiny are 'equal' as

that term is used in the EPA."  Welde, 864 F.Supp. at 442.  "[T]wo positions are

not substantially equal if the more highly paid one entails 'additional tasks' that (1)

require more skill, effort, or responsibility, (2) consume a significant amount of

time, or (3) provide 'economic' value [to the employer] commensurate with the

pay differential." Lord, 2009 WL 55949, at *1 (citing Best v. Janerich, 80 F. Supp.

2d 334, 337 (M.D. Pa. 1999) (Munley, J.)).  "'Failure to furnish equal pay for

'comparable work' or 'like jobs' is not cognizable under the Act.'"  Welde, 864

F.Supp. at 442 (quoting Nulf v. Int'l Paper Co., 656 F.2d 553, 560 (10th Cir.

1981)).  Nevertheless, "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable."  29 C.F.R. § 1620.14(a).

If plaintiff satisfies this charge, the burden of persuasion falls to the employer to demonstrate that the wage disparity results from applicability of one of four statutory affirmative defenses.  Stanziale, 200 F.3d at 107.[8]  An employer must establish the defense's applicability "so clearly that no rational jury could have found to the contrary" in order to prevail at the summary judgment stage.  EEOC v. Del. Dep't of Health & Soc. Servs., 865 F.2d 1408, 1414 (3d Cir. 1989)).  To satisfy its burden, "the employer must submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons could explain the wage disparity, but that the proffered reasons do in fact explain the wage disparity."  Stanziale, 200 F.3d at 107.  "Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate."  Brobst, 761 F.2d at 156 (citations omitted).

With this legal framework in mind, we turn to the facts of the case.

A.  Plaintiff's Prima Facie Case

_____

[8]The four affirmative defenses enumerated under the EPA are: (I) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1).

It is clear that Glodek was paid less than Knight, an individual of the opposite sex; therefore, we begin our substantive analysis with the equal work provision.[9]

### 1. Equal Skill

In determining whether jobs require "equal skill," factors such as experience, training, education and ability are considered. 29 C.F.R. § 1620.15(a). Skill "must be measured in terms of the performance requirements of the job." Id. Where the skill is not necessary to meet the requirements of a position, it shall not be considered in evaluating skill equality. Id.

Defendant contends that Glodek's "'skill'" as an [MO] was vastly different than that possessed by Knight," because Knight demonstrated the ability to produce at a high level in the State College market, had contacts within the State College market that would prove profitable, was college educated and was trained by national mortgage companies.

Seemingly, defendant argues that Knight is more proficient or adept at performing the tasks an MO is required to perform. However, this argument is without merit when couched in terms of equal skill. Under this prong of the prima

---

[9]Plaintiff's opposing brief also mentions Barry Peters and Keith Boyles as comparators; however, plaintiff did not proffer anything substantive regarding these individuals. (Rec. Doc. No. 26, p. 9) Henceforth, our analysis is limited to defendant's treatment of plaintiff in relation to Knight.

facie test, the question is whether the skills are necessary to perform the job, not whether they make one individual better at the job than the other. To this end, defendant offers nothing to indicate that Knight's alleged additional skills were prerequisites for the position..

Additionally, the Bank has not established that Knight is indeed more skilled than Glodek; the contention that Knight was a "top producer" is vague at best; no evidence in the record indicates that Knight was more successful at producing business in the past than Glodek. Furthermore, defendant, emphasizing Knight's alleged contacts, conveniently ignores that, at the time Knight was hired, Glodek had spent four (4) years establishing contacts in her territory, one (1) more year than Knight had dedicated to developing a book of business in State College.

With respect to Knight's education and training, defendant has failed to demonstrate that Glodek is clearly less educated or has received less training than Knight. Neither Glodek nor Knight earned an undergraduate degree, and Knight is definitively more educated in regards to the MO position only in the sense that attending a higher education institution longer qualifies one as more educated. Considering the lack of contextual evidence demonstrating the importance of Knight's education over Glodek's, it is possible for a reasonable factfinder to hold that Glodek's accounting background addresses the needs of the MO position

better than Knight's marketing education, especially when one takes into account that MOs concentrate a majority of their efforts on examining and evaluating customers' financial statements and desires.  <u>See</u> (Rec. Doc. No. 28-7, p. 2).

As for the training Knight received at Washington Mutual and Wells Fargo, defendant, without reservation, admitted that Knight's experience with subprime lending is largely inapplicable to JSSB because the Bank does not offer subprime products.  Therefore, although subprime lending may be considered more difficult than conventional lending, a reasonable jury could certainly find that, because defendant's business was founded upon trafficking in PHFA loans, something with which Knight had no experience, Glodek's intimate familiarity with that type of loan rendered her training more impressive.

Therefore, we find that plaintiff has proffered enough evidence to establish a prima facie case regarding whether Knight and Glodek were substantially and similarly skilled.

## 2.  <u>Equal Effort</u>

If there exists a substantial difference in the amount or degree of effort required in the performance of jobs, the EPA will not apply even if the jobs are equal in all other respects.  29 C.F.R. § 1620.16(a).  "Effort" is the "measurement of the physical or mental exertion needed for the performance of a job."  <u>Id.</u>

Therefore, jobs may require "equal effort" even if the effort is exerted in different ways. Id.

Here, defendant claims Glodek did not exert the same effort as Knight in the performance of her job because Knight operated in a more competitive region, while Glodek was responsible for a rural geographic area with few competitors. In support of its claim, defendant directs us to the production goals established for Glodek and Knight, stressing the disparity between the two. We are unmoved.

We find defendant's reliance on the "more competitive market" theory does not accurately address the equal effort concept. Defendant has not provided us with specific evidence indicating the disparity between the markets during the time period relevant to this case;[10] instead it generally claims that the SCO must simply produce within a more competitive atmosphere. Assuming, arguendo, that this is true, we are still faced with the question of effort. That one's market is more competitive does not necessarily indicate that one must work harder to produce business. Although there may be more banks within the SCO's market, common sense dictates that there is also access to more resources and customers with which

[10]Defendant noted that the SCO must compete with nineteen (19) other banks in the State College area at the present time. As previously discussed, however, defendant does not indicate how many competitors existed at the times poignant to this case, nor does it provide more than a passing comparison between the two markets. Consequently, defendant's assertion is largely irrelevant.

to generate business; a reasonable factfinder could surmise that, in a rural setting with a limited population, one would need to retain a higher percentage of customers solicited in order to produce comparable numbers, thereby increasing the difficulty of that position and the effort required to succeed. Additionally, following Knight's hire, the SCO was manned by multiple MOs, while Glodek was charged with covering her territory on her own. Although defendant clearly intimates that MOs within the SCO must put forth more effort than those working out of the MBO, such a claim is supposition, lacking definitive support from the record evidence. Even if, for arguments sake, we stipulate that a competitive environment requires greater mental exertion as a rule, defendant has not addressed the additional physical burdens Glodek faced working out of the MBO. A reasonable factfinder could surely conclude that the physical demands placed upon a single MO entrusted with covering such a large geographic area abrogate the mental effort necessitated by a  more competitive environment.

The production goals JSSB established could be interpreted one of two ways. First, as defendant claims, it could indicate that MOs stationed in the SCO were required to put forth greater mental effort in order to meet the company's demands. Assuming, <u>arguendo</u>, that is true, defendant's assertion still fails to address the physical effort required of Glodek. In contrast, JSSB's goals could

also indicate that, despite operating within a market with more competitors, it is easier for SCO MOs to produce than those based in the MBO. The lack of evidence clearly indicating one way or the other demands that we leave this question unmolested for a jury to examine.

For the forgoing reasons, plaintiff has established a prima facie case insofar as it relates to equal effort.

### 3. Equal Responsibility

For the EPA to apply, the jobs must require "equal responsibility." As noted earlier, "[r]esponsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a).

Defendant avers that Knight's production goals indicate he was burdened with greater responsibility than Glodek. Essentially, defendant repeats its equal effort argument. We are not persuaded

As we noted above, the production goals could indicate a number of different things. While one of those things might be differentiations in effort, unequal responsibility is not. Regardless of the production goals established for the individual MOs, no evidence presented indicates that Knight was more accountable than Glodek or that Knight was required to entertain tasks from which

Glodek was exempt.  That JSSB hoped Knight would produce more business than Glodek does not indicate additional responsibilities were assigned to either employee.

In reference to equal responsibility, plaintiff has established a prima facie case.

### 4.  Similar Working Conditions

For the EPA to apply, the jobs in question must be  performed under "similar working conditions."  This examination depends upon two factors: (1) the physical surroundings of the work; and (2) the frequency and severity of exposure to physical hazards.  29 C.F.R. § 1620.18(a).  "'Surroundings'"  measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency."  Id.  "'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause."  Id.

As plaintiff properly notes, defendant did not address whether Knight and Glodek worked under similar conditions.[11]  Instead, defendant essentially claims that Knight is not a proper comparator for Glodek because they did not work

---

[11]To the extent that one would interpret defendant's argument as addressing the working conditions in question, we conclude that Knight and Glodek worked in similar office surroundings, with limited, if any, hazards.  Plaintiff has established a prima facie case under the equal responsibility provision.

within a single establishment as required under the EPA.  <u>See</u> 29. U.S.C. 206(d)(1).

We disagree.

"Establishment" refers to "a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business."  29 C.F.R. § 1620.9(a).  However, where a central administrative unit hires all employees, sets wages, assigns location of employment and assigns virtually identical duties to be performed under similar working conditions, multiple places of business may be considered a single establishment.  29 C.F.R. § 1620.9(b).

There is no doubt that this caveat applies in the case at bar.  JSSB's MOs all reported to Seman, who, along with the Mortgage Department, was headquartered in the Bank's corporate offices in Williamsport.  Additionally, defendant admitted that all aspects of employment, including hiring, salary determination and production goals, were addressed by the corporate office.  <u>See</u> (Rec. Doc. No. 20, pp. 4-5, 9-11, ¶¶ 20, 28, 65, 74, 83).

Therefore, since we have determined that plaintiff has established a prima facie case regarding the equal work requirement, and because it is clear that JSSB's Williamsport corporate office dictated the conditions of employment for every MO, we hold that the MBO and the SCO are part of one establishment within the

meaning of the EPA. "A contrary result obtained through narrow construction of the word 'establishment' could 'make proof of discrimination more difficult, thus frustrating congressional intent.'" Mulhall v. Advance Sec., Inc., 19 F.3d 586, 591 (11th Cir. 1994) (quoting Brennan v. Goose Creek Consolidated Indep. Sch. Dist., 519 F.2d 53, 57 (5th Cir. 1975)).

B.  Defendant's Affirmative Defense

Defendant relies upon its claim that it used historical production, the competitive nature of the State College market, individual salary demands and expectations of the individual employees to determine the salaries in question as an affirmative defense that the pay differential between plaintiff and Knight derived from a "factor other than sex." 29 U.S.C. § 206(d)(1).  This defense is a "'broad 'catch all' exception and embraces an almost limitless number of factors, so long as they do not involve sex.'" Day v. Bethlehem Center School Dist., No. 07-CV-159, 2008 WL 2036903, at *8 (W.D. Pa. May 9, 2008) (quoting Fallon v. Illinois, 882 F.2d 1206, 1211 (7th Cir. 1989)).

To the extent that defendant explains the pay disparity by citing historical production and its competitive market theory, we acknowledge that our analysis referencing these arguments above is equally applicable here and conclude that genuine issues of material facts exist regarding whether these explanations do, in

fact, resolve the pay differential issue.

As far as the defendant's claim that Knight's salary demands exceeded Glodek's is concerned, defendant is not entitled to summary judgment on the basis of this argument. Though salary demands are not entirely irrelevant, it would be inequitable to permit defendant to shelter itself from liability by stating that one individual received greater compensation than another simply because he or she requested it. Id. at 9 ("The fact that the comparators successfully negotiated to start at a higher pay for their salary, standing alone, is not dispositive, and does not entitle Defendant to summary judgment") (citing Klaus v. Hilb, Rogal & Hamilton Co. Of Ohio, 437 F. Supp. 2d 706, 724 (S.D. Ohio 2006). Additionally, that plaintiff initially requested a lower minimum salary four (4) years before Knight was hired does not address defendant's decision to pay Glodek approximately $16,000 less than Knight in 2003, nor does it reasonably suggest that plaintiff did not desire or was not entitled to a comparable level of compensation.

Finally, defendant contends that the pay differential may be explained by JSSB's expectations for Glodek's and Knight's production, and Knight's subsequent achievement of those goals. However, it is important to note that defendant admits that production is evaluated in relation to the individual's goals, not those assigned to other MOs. Moreover, despite defendant's claims, Knight

actually failed to meet his production goal in the only full fiscal year in which he was employed by JSSB.

Plaintiff, on the other hand, adduced evidence indicating that her lending experience and training, especially regarding JSSB's products, were superior to her comparator's, drawing into question whether the proposed expectations could explain the significant salary gap. This is paramount when one takes into account the general pay disparity pattern between male and female MOs at JSSB, especially when examined in concert with the MO production numbers. <u>See</u> (Rec. Doc. No. 28-2, p. 2; Rec. Doc. No. 28-10, pp. 2-5).

We also find it important to note that defendant is essentially arguing that Knight should receive a higher wage because of the economic benefits JSSB expected from his work. Although we recognize the possible validity of such a claim, the employer must first demonstrate that the hiree's work was actually more profitable. <u>E.E.O.C. v. Hay Associates</u>, 545 F.Supp. 1064, 1084 (E.D. Pa. 1982). And, while JSSB has demonstrated that Knight produced more revenue than Glodek during the relevant times, it has provided no evidence regarding profit.

Furthermore, this claim, much like the defendant's other arguments, is largely dependent upon testimony and individuals' supposed motivations, which require credibility determinations. Such evaluations are squarely within the jury's

purview.  Metzger v. Osbeck, 841 F.2d 518, 521 (3d Cir. 1988) ("[A] court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder.").

The congruence between Glodek's and Knight's positions, coupled with the evidence indicating that Glodek was more experienced and better trained for the MO position, could cause reasonable jurors to question whether plaintiff's pay differential resulted exclusively from defendant's various justifications.

Summary judgment is precluded in the case at bar; JSSB has not established its affirmative defenses "so clearly that no rational jury could find to the contrary." Del. Dep't of Health & Soc. Servs., 865 F.2d at 1414.

## IV. **Plaintiff's Title VII Claim**

### A. Ripeness

Defendant contends that plaintiff's Title VII claim is time barred, claiming that she filed her charge of discrimination three hundred and forty-four days (344) days after her employment concluded.

Under Title VII, a plaintiff must file a complaint with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person initially institutes a proceeding with a state or local agency with authority to grant or seek relief from such practice. 42 U.S.C. § 2000e-5(e).[12] On January 3, 2006, plaintiff filed a PHRC unequal pay intake questionnaire with the EEOC, requesting that it be construed as her complaint. (Rec. Doc. No. 28-11, pp. 2-12, 21). The EEOC received the questionnaire on January 11, 2006, (id.), and acknowledged receipt of the forms in a letter dated January 26, 2006. (Rec. Doc. No. 28-11, p. 12). In a letter dated January 30, 2006, the EEOC noted that Glodek provided information "sufficient for the charge to be docketed" and that a draft charge was included therein. (Id. at pp. 14).

---

[12]Plaintiff resigned from JSSB on March 25, 2005, (Rec. Doc. No. 20, p. 7, ¶ 47), and instituted a proceeding with the PA Human Relations Comission ("PHRC"). Consequently, plaintiff was required to file a complaint with the EEOC on or before January 19, 2006, in order to satisfy Title VII requirements.

By a March 2, 2006 letter, the EEOC sent the finalized charge to Glodek. (Id. at p. 15). Glodek signed the charge on March 4, 2006, three hundred and forty-four (344) days after the last act of alleged discrimination, and it was received by the EEOC on March 6, 2006. (Rec. Doc. 22-2, p. 69).

Under these circumstances, we will construe Glodek's January 3, 2006 questionnaire as the filing of an EEOC charge. While a formal charge was not signed by Glodek until March 4, 2006, the January 3, 2006 questionnaire contained an allegation of discrimination, the name of the charged party and a request for the agency to take action. Therefore, plaintiff's filing of a questionnaire may be construed as the filing of a charge. See 29 C.F.R. § 1601.12; Federal Exp. Corp. v. Holowecki, 128 S.Ct. 1147, 1156-58 (2008); Bihler v. Singer Co., 710 F.2d 96, 99 (3d Cir. 1983); Grigsby v. Pratt & Whitney Amercon, Inc., No. 07-CV-0785, 2008 WL 2156355, at *4-5 (M.D. Pa. May 21, 2008) (Rambo, J.). We therefore hold that Glodek's charge was timely filed on January 3, 2006.

B. Prima Facie Case

"A violation of the EPA constitutes a violation of Title VII. Thus, a prima facie showing of an EPA claim is also a prima facie showing of a Title VII violation." Miller v. Beneficial Management Corp., 977 F.2d 834, 846 (3d Cir. 1992). Therefore, because we have determined that plaintiff demonstrated a prima

facie case in regards to her EPA claim, we hold that she has likewise established a Title VII prima facie case.

## C. <u>McDonnell Douglas Corp.</u> Test

Unequal pay claims brought under Title VII are analyzed under the familiar burden shifting paradigm enunciated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). Consequently, once plaintiff has established a prima facie case of unequal pay, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the pay differential. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. Defendant clearly carries this burden, providing several gender-neutral explanations, including historical production, the competitive nature of the State College market, individual salary demands and expectations of the individual employees to determine the salaries.

Finally, if the defendant carries this burden, then the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are not true but rather act as mere pretext for the discrimination. <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999) (citations omitted). In order to accomplish this, plaintiff must proffer evidence, "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). For the reasons articulated <u>supra</u> in Section III.B, we conclude that plaintiff has proffered evidence which would permit a reasonable factfinder to disbelieve defendant's non-discriminatory explanations for the pay disparity between Glodek and Knight.

Where a plaintiff's EPA claim survives summary judgment, a related Title VII unequal pay action will also endure. Defendant is not entitled to judgment as a matter of law.

## CONCLUSION:

For the foregoing reasons, we will deny defendant's motion for summary judgment.


                           <u>    s/ James F. McClure, Jr.                   </u>
                           James F. McClure, Jr.
                           United States District Judge




IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA GLODEK              :
                                       :
              Plaintiff         :                No. 4:07-CV-2237
                                         :
      v.                         :                (Judge McClure)
                                         :
JERSEY SHORE STATE BANK,    :
                                         :
             Defendant.     :

**O R D E R**

August 28, 2009

In accordance with the accompanying Memorandum,

**IT IS HEREBY ORDERED THAT:**

1.      Defendant's motion for summary judgment is DENIED.  (Rec. Doc. No. 19).

2.      Defendant's motion to declare defendant's concise statement of undisputed facts admitted and/or strike portions of plaintiff's response to defendant's concise statement is DENIED.  (Rec. Doc. No. 30).

                                  s/ James F. McClure, Jr.
                                James F. McClure, Jr.
                                United States District Judge